PAPAS v GAMING CONTROL BOARD

Docket No. 243989. Submitted May 13, 2003, at Detroit. Decided August 5, 2003, at 9:00 A.M.

Dimitrios Papas and other owners of several Detroit restaurants, a conference center, and a hotel, which provide Detroit casino patrons food or hotel accommodations in exchange for coupons issued and paid for by the casinos, brought an action in the Wayne Circuit Court against the Michigan Gaming Control Board, the state agency having regulatory authority over the non-Indian casinos located in Detroit, alleging that, because all the goods and services at issue were supplied to casino patrons outside the casinos and there were no contracts between the plaintiffs' businesses and the casinos, the plaintiffs were not subject to the jurisdiction of the defendant. The defendant asserted that it was the proper forum for determining any licensing issues and who is a "supplier" subject to licensure under the Gaming Control and Revenue Act, MCL 432.201 *et seq.* The court, Warfield Moore, Jr., J., granted the plaintiffs' motion for partial summary disposition, holding that the plaintiffs' participation in the coupon redemption program did not make the plaintiffs businesses suppliers to the casinos. The court also denied the defendant's motion for summary disposition. The defendant appealed by leave granted.

The Court of Appeals *held*:

1. The Legislature has vested the defendant with exclusive jurisdiction over all matters relating in any way to the licensing, regulating, monitoring, and control of the non-Indian casino industry in Michigan. The circuit court erred in assuming jurisdiction over this matter.

2. The defendant is the final arbiter of who fits within the definition of "supplier" found in MCL 432.202(gg).

3. The plaintiffs' conclusory allegations of constitutional violations are insufficient as a matter of law to avoid the regulatory scheme created by the Legislature for the monitoring, licensing, and control of the non-Indian casino industry in Michigan. The plaintiffs were required to exhaust administrative remedies notwithstanding their claims of constitutional violations.

4. The plaintiffs failed to establish that exhaustion of administration remedies would be futile.

Reversed.

SAWYER, J., dissenting, stated that the circuit court had the jurisdiction to answer the question whether the plaintiffs, having taken the position that hospitality vendors who would participate in the proposed coupon program would not be a "casino supplier" subject to licensing, may obtain such a declaration in the circuit court without first submitting the question to the defendant. The doctrine of primary jurisdiction does not apply to this matter. The question of statutory interpretation involved is well suited for the courts to answer. The circuit court could properly address the issue whether the defendant had the authority to act in the first place without deferring to the defendant under either the doctrine of primary jurisdiction or the requirement of exhaustion of administrative remedies. The circuit court properly determined that this case presents an actual controversy for which the court could grant declaratory relief. The coupon program lies outside the defendant's regulatory authority. The defendant may not require the plaintiffs to obtain a supplier license or exemption. The plaintiffs provide services to casino patrons, not the casinos themselves, and are not casino suppliers. The statute does not permit the defendant to designate as a "supplier" a person who does not provide goods or services to a casino. The order of the circuit court should be affirmed.

1. ADMINISTRATIVE LAW — GAMING CONTROL BOARD — LICENSES — WORDS AND PHRASES — SUPPLIER.

The Gaming Control Board has exclusive jurisdiction over matters involving the licensing and regulation of the non-Indian casino gaming industry in Michigan, including the determination whether persons are casino "suppliers" subject to regulation and licensing under the Gaming Control and Revenue Act (MCL 432.201 *et seq.*).

2. ADMINISTRATIVE LAW — GAMING CONTROL BOARD — WORDS AND PHRASES — SUPPLIER.

Any person or business that provides goods or services to a casino must be licensed as a casino supplier unless exempted from such licensure by the Gaming Control Board pursuant to the provisions of the Gaming Control and Revenue Act; the board is the arbiter of who fits within the definition of "supplier" found in the act (MCL 432.202[gg]).

*Kienbaum Opperwall Hardy & Pelton, P.L.C.* (by *Thomas G. Kienbaum, Theodore R. Opperwall,* and

*Jay C. Boger*) (*Patricia J. Boyle*, of counsel), for the plaintiffs.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Eric J. Eggan* and *John M. Cahill*, Assistant Attorneys General, for the defendant.

Before: COOPER, P.J., and SAWYER and ZAHRA, JJ.

ZAHRA, J. Defendant, the Michigan Gaming Control Board, a state agency having regulatory authority over the non-Indian casinos located in the city of Detroit, appeals by leave granted from an order of the circuit court denying defendant's motion for summary disposition and granting plaintiffs' motion for partial summary disposition. Plaintiffs are owners of several Detroit restaurants, a conference center, and a hotel. Plaintiffs' businesses provided casino patrons with food or hotel accommodations in exchange for casino-issued coupons. Plaintiffs' businesses would present the coupons to the casinos for payment for the goods or services provided to the casinos' patrons. The issue presented in this case is whether defendant has exclusive jurisdiction over matters involving the licensing and regulation of the gaming industry, including the determination whether plaintiffs are casino "suppliers" subject to regulation and licensing under the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq.* We conclude that defendant does have exclusive jurisdiction over the matters involved in this case. We reverse.

### I. FACTS AND PROCEDURE

Plaintiffs were at one time part-owners of the entity that owns and operates the Greektown Casino. As

prospective casino owners, plaintiffs applied for licensing as required by the act. When doubt arose regarding whether plaintiffs' application was going to be approved, plaintiffs arranged to sell their interest in the casino to their partner, the Sault Ste. Marie Tribe of Chippewa Indians. Plaintiffs retain ownership, however, of several businesses near the Greektown Casino, including Pegasus Taverna, Fishbone's Rhythm Kitchen Café, the International Business and Conference Center, and the Atheneum Hotel.

The act requires that any person or business providing goods or services to a casino must be licensed as a casino supplier. MCL 432.207a. However, the act also provides some exemptions from the supplier licensing requirements. One of the exemptions is the "field of commerce" exemption adopted by the board in Resolution and Order No. 2000-02, adopted June 13, 2000. In that resolution, the board acknowledged that it is a common marketing practice of casinos to reward their patrons with complimentary amenities such as lodging and other related hospitality and entertainment services in order to attract business. However, because the casinos are initially housed in temporary facilities that do not permit them to provide such amenities, casinos are forced to rely on outside vendors. Resolution 2000-02 indicates that the board has the discretion to exempt these vendors from the ordinary supplier licensing requirements until permanent casino facilities are completed. Among the vendors listed as eligible for the exemption are "theatres, ballrooms, halls, arenas, parks, stadia, golf courses, and other entertainment, recreational and sports facilities located in the State of Michigan." In addition, the resolution indicates that the board may exempt the following:

> Hotels, motels or other lodging facilities, located within the State of Michigan, which regularly offer rooms to the general public to the extent that they provide lodging and other hospitality facilities and services to casino patrons that are directly purchased or reimbursed by a licensed casino. This exemption includes all goods and services ordinarily available to the provider's customers, including, but not limited to, food and beverage services, . . . [and] convention and banquet services.

In order to qualify for the field of commerce exemption, a business is required to file a written request and related disclosure forms with the board. The board reserves the right to evaluate each request and to deny a request whenever it determines that denial is necessary to protect the public interest or accomplish the purposes of the act.

In August 2000, plaintiffs submitted field of commerce exemption requests for each of their four businesses. Plaintiffs represented that they were supplying goods and services to casinos and provided copies of agreements between themselves and Greektown Casino. On February 7, 2001, the board denied the exemption requests on the ground that plaintiffs failed to pass their background checks when they applied for a casino license, and this fact could require the board to find them unsuitable for licensure. Because plaintiffs represented that they were supplying goods and services to a casino on a regular basis, the board directed them to apply for supplier licenses within thirty days.

Plaintiffs did not appeal this decision, nor did they submit the required supplier license applications within thirty days. As a result, their vendor identification numbers were inactivated and the casino operators were prohibited from doing business with them.

A March 9, 2001, letter advised plaintiffs that their businesses could be placed back on the active vendor list if they submitted completed applications for supplier licenses. Plaintiffs never did so. Instead, two of plaintiffs' businesses, the Atheneum Hotel and International Market Place, contracted with Detroit Hospitality, L.L.C., a licensed casino supplier, to provide hospitality, entertainment, and other complimentary services to Detroit casinos.

On July 25, 2001, the Atheneum submitted another field of commerce exemption request, which included a copy of the agreement entered into between the Atheneum and Detroit Hospitality. In its request, the Atheneum explained that it did not have a contract with any Detroit casino and that it did not consider itself to be a casino supplier under the terms of the act. The Atheneum further stated that it had a contract with Detroit Hospitality, under which it provided hotel, lodging, banquet, food, beverage, conference facilities, and other related goods and services to customers referred to it by Detroit Hospitality, and that it had no control over whether those customers were casino patrons.

Plaintiffs, through the Atheneum and International Market Place, performed under their contracts with Detroit Hospitality until July 31, 2001, at which time Detroit Hospitality notified plaintiffs that the contracts were being terminated on the basis of a directive from defendant. On August 2, 2001, the Atheneum and International Market Place sent letters to defendant, which included a "Vendor Notification and Disclosure Form." Each of the Vendor Notification and Disclosure Forms indicated that the form must be completed by any vendor providing nongaming

related goods or services for a casino or casino enterprise. The forms noted that they should not be sent to defendant, but that the information must be submitted to the casino or casino enterprise for processing, and that the casino or casino enterprise was responsible for forwarding the requested information to defendant. Although neither form identified which of the casino or casino enterprises were to be provided services, each form included Greektown; Detroit Entertainment, L.L.C.; and MGM Grand Detroit, L.L.C., and questioned whether the vendor had a direct contract with the casino or casino enterprise. In the forms, both the Atheneum and International Market Place indicated that there was not a direct contract with either a casino or a casino enterprise.

On September 5, 2001, defendant sent a letter to International Market Place acknowledging that defendant received the submission of a Vendor Notification & Disclosure Form for International Market Place. The letter also indicated that the "request" would not be processed further because Detroit Hospitality had terminated its agreement with International Market Place on August 1, 2001.[1]

On January 10, 2002, defendant sent the Atheneum a letter, which included a copy of a January 9, 2002, order denying the Atheneum's request for an exemption from the supplier licensing requirements. Defendant found that Detroit Hospitality entered into the agreement with the Atheneum in order to acquire hotel, lodging, and related hospitality services from the Atheneum for the complimentary use and benefit

---

[1] It is not apparent from the letter what "request" was no longer being processed.

of Greektown Casino patrons, and that such services were reimbursed and paid for by the casino through Detroit Hospitality. Defendant determined that the Atheneum was a supplier of hotel, lodging, and related hospitality services to Greektown Casino and that the Atheneum was subject to the supplier licensing requirements. Defendant further determined that licensing was deemed necessary because the individuals having an ownership interest and the officers and directors of the Atheneum were previously investigated and found to have several "serious apparent deficiencies" that could require defendant to find them unsuitable for licensure, and that the individuals withdrew their application for a casino license before defendant made a final determination regarding the "alleged apparent deficiencies" and lack of suitability for a license. Defendant also found that the Atheneum offered no evidence that the "alleged apparent deficiencies" were corrected.

Thereafter, plaintiffs initiated a lawsuit in circuit court entitled "Complaint for Declaratory Judgment, Injunctive Relief, Mandamus and/or Superintending Control[.]" Plaintiffs claimed, in part, that because all the goods and services at issue were supplied to casino patrons outside the casino, and there was no contract between plaintiffs' businesses and the casino, they were not subject to the jurisdiction of the board. The board moved for summary disposition, challenging the jurisdiction of the circuit court to decide whether plaintiffs were "suppliers" as defined by the act, and asserting that the board was the proper forum for determining licensing issues. Plaintiffs moved for partial summary disposition on the issue regarding the coupon program, asking the court

to declare that restaurants and hotels are not suppliers of goods or services to a casino when they participate in coupon redemption programs. The trial court concluded that participation in a coupon program through which plaintiffs supplied goods and services to casino patrons did not make plaintiffs' businesses suppliers to the casinos, and granted plaintiffs' motion for partial summary disposition. The board's motion for summary disposition was also denied. In so ruling, the trial court relied on *Silverman v Univ of Michigan Bd of Regents*, 445 Mich 209, 217; 516 NW2d 54 (1994), in which the Supreme Court stated that the circuit court is the proper venue for claims seeking equitable or declaratory relief against the state. We granted defendant's application for leave to appeal.

## II. ANALYSIS

The board contends that the circuit court should not have exercised jurisdiction over this matter until the issue regarding whether plaintiffs are required to be licensed as casino suppliers is fully and finally resolved through administrative proceedings. The board maintains that plaintiffs have participated in administrative proceedings relating to casino and casino supplier licensing and in each instance plaintiffs have either abandoned the process or declined to pursue other administrative avenues of relief available to them. The board further claims that plaintiffs have failed to establish that exhaustion of administrative remedies would be futile. The board contends that if this evasive bypass of the board's jurisdiction is allowed to stand, it will create chaos in what the Legislature intended to be a highly regulated industry

with a single forum for the control of activities related to casino gaming.

Plaintiffs contend that they are not challenging any specific agency decision, but, instead, are contending that the board had no statutory jurisdiction to take action in regard to a hotel or restaurant's acceptance and redemption of coupons. Plaintiffs maintain that the circuit court is the appropriate forum to determine the scope of the agency's jurisdiction—not the agency itself, as alleged by the board. Plaintiffs further allege that the board's actions, as they relate to the plaintiffs, involve a series of torts involving constitutional violations over which the circuit court has plenary jurisdiction. Plaintiffs argue that they need not exhaust administrative remedies before the very agency that committed the alleged constitutional violations. Finally, plaintiffs maintain that exhaustion of administrative remedies would be futile because the board is predisposed to rule against them.

### A. STANDARD OF REVIEW

"This Court reviews decisions on motions for summary disposition de novo." *Durcon Co v Detroit Edison Co*, 250 Mich App 553, 556; 655 NW2d 304 (2002). Motions for summary disposition involving questions of subject-matter jurisdiction are properly brought under MCR 2.116(C)(4). *Manning v Amerman*, 229 Mich App 608, 610, 615; 582 NW2d 539 (1998). Additionally, "[s]ummary disposition for lack of jurisdiction under MCR 2.116(C)(4) is proper when a plaintiff has failed to exhaust its administrative remedies." *Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 50; 620 NW2d 546 (2000). Jurisdictional questions under MCR

2.116(C)(4) are questions of law that are also reviewed de novo. *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205; 631 NW2d 733 (2001).

B. THE EXCLUSIVE JURISDICTION OF THE MICHIGAN
GAMING CONTROL BOARD

Circuit courts are courts of general jurisdiction, vested with original jurisdiction over all civil claims and remedies "except where exclusive jurisdiction is given in the constitution or by statute to some other court . . . ." MCL 600.605; *Bowie v Arder*, 441 Mich 23, 50; 490 NW2d 568 (1992). In *Citizens for Common Sense in Gov't, supra* at 50, this Court explained:

> . The circuit courts of this state have subject-matter jurisdiction to issue declaratory rulings, injunctions, or writs of mandamus. Const 1963, art 6, § 13; MCL 600.605 . . . . However, if the Legislature has expressed an intent to make an administrative tribunal's jurisdiction exclusive, then the circuit court cannot exercise jurisdiction over those same areas. MCL 600.605 . . . .

This Court has not required the phrase "exclusive jurisdiction" to appear in a statutory provision in order to find that jurisdiction has been vested exclusively in an administrative agency. *Capital Region Airport Auth v DeWitt Charter Twp*, 236 Mich App 576, 590-591; 601 NW2d 141 (1999). As long as the statutory language chosen by the Legislature establishes the intent to endow the state agency with exclusive jurisdiction, courts must decline to exercise jurisdiction until all administrative proceedings are complete. *Id.* Thus, a determination whether defendant has exclusive jurisdiction over the issues

presented in this case requires an interpretation of the act.

In interpreting the act, we must ascertain and give effect to the intent of the Legislature. *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999); *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998). To determine the intent of the Legislature, we must first review the language of the statute itself. *House Speaker v State Admin Bd*, 441 Mich 547, 567; 495 NW2d 539 (1993). If the statute is unambiguous on its face, the Legislature is presumed to have intended the meaning plainly expressed and further judicial interpretation is not permitted. *Lorencz v Ford Motor Co*, 439 Mich 370, 376; 483 NW2d 844 (1992).

"Only where the statutory language is ambiguous may a court properly go beyond the words of the statute to ascertain legislative intent." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). An ambiguity of statutory language does not exist merely because a reviewing court questions whether the Legislature intended the consequences of the language under review. An ambiguity can be found only where the language of a statute, as used in its particular context, has more than one common and accepted meaning. *Frame v Nehls*, 452 Mich 171, 176; 550 NW2d 739 (1996). Thus, where common words used in their ordinary fashion lead to a single reasonable interpretation, the statute is not ambiguous.

Reviewing the act under the above referenced rules of construction, we conclude that the Legislature vested the board with exclusive jurisdiction over all matters relating in any way to the licensing, regulating, monitoring, and control of the non-Indian casino

industry. MCL 432.204(1) provides that defendant has "the powers and duties specified in this act and all other powers necessary and proper to fully and effectively execute and administer this act for the purpose of licensing, regulating, and enforcing the system of casino gambling established under this act." The act specifically addresses the board's jurisdiction. MCL 432.204a(1) provides that "[t]he board shall have jurisdiction over and shall supervise all gaming operations governed by this act. The board shall have all powers necessary and proper to fully and effectively execute this act . . . ." The act provides a nonexhaustive list of powers granted to the board. For example, MCL 432.204a(1)(a) provides defendant with the investigative powers over applicants for casino licenses as well as the ability to grant and deny licenses under the act.[2] Additionally, MCL 432.204a(1)(e) confers

---

[2] MCL 432.204a(1) provides, in relevant part:

The board shall have jurisdiction over and shall supervise all gambling operations governed by this act. The board shall have all powers necessary and proper to fully and effectively execute this act, including, but not limited to, the authority to do all of the following:
(a) Investigate applicants and determine the eligibility of applicants for licenses or registration and to grant licenses to applicants in accordance with this act and the rules promulgated under this act.

\*   \*   \*

(e) Adopt standards for the licensing of all persons under this act, as well as for electronic or mechanical gambling games or gambling games, and to establish fees for the licenses.

\*   \*   \*

(k) Revoke or suspend licenses, impose fines and penalties as the board considers necessary and in compliance with applicable laws of the state regarding administrative procedures, and review

jurisdiction to "[a]dopt standards for the licensing of all persons under this act . . . ." Subsections 4a(1)(k) and (m) empower the board to revoke, restrict, or suspend licenses. Further, subsection 4a(1)(v) permits the board to "[t]ake any other action as may be reasonable or appropriate to enforce this act and rules promulgated by the board." Finally, in the definition of "supplier" found in MCL 432.202(gg), the Legislature expressed its intention that the board be

---

and decide applications for the renewal of licenses. The board may suspend a casino license, without notice or hearing upon a determination that the safety or health of patrons or employees is jeopardized by continuing a casino's operation. If the board suspends a license under this subdivision without notice or hearing, a prompt postsuspension hearing shall be held to determine if the suspension should remain in effect. The suspension may remain in effect until the board determines that the cause for suspension has been abated. The board may revoke the casino license upon a determination that the owner has not made satisfactory progress toward abating the hazard.

\*          \*          \*

(m) Suspend, revoke, or restrict licenses and require the removal of a licensee or an employee of a licensee for a violation of this act or a rule promulgated by the board or for engaging in a fraudulent practice, and impose civil penalties of up to $5,000.00 against individuals and up to $10,000.00 or an amount equal to the daily gross receipts, whichever is greater, against casino licensees for each violation of this act, any rules promulgated by the board, any order of the board, or for any other action which the board determines is a detriment or impediment to casino gambling operations.

\*          \*          \*

(s) Perform a background check, at the vendor's expense, of any vendor using the same standards that the board uses in determining whether to grant a supplier's license.

\*          \*          \*

(v) Take any other action as may be reasonable or appropriate to enforce this act and rules promulgated by the board.

the arbiter of who fits within that definition.[3] A supplier is "a person *who the board has identified* under rules promulgated by the board as requiring a license to provide . . . goods or services . . . ." MCL 432.202(gg) (emphasis added). Accordingly, on the basis of the above referenced statutory provisions, it is evident that the Legislature conferred exclusive jurisdiction on defendant regarding not only matters of licensing, but also with respect to the factual issue whether a person or entity is a casino supplier so that licensing is required under the act.[4]

Plaintiffs rely on *Huggett v Dep't of Natural Resources*, 232 Mich App 188; 590 NW2d 747 (1998), aff'd 464 Mich 711; 629 NW2d 915 (2001), as authority for the proposition that the circuit court may assume jurisdiction over the matter. The statute at issue in *Huggett* is distinguishable from the statute at issue in this case. *Huggett* involved a matter of statutory interpretation "that did not call for extensive findings of

---

[3] MCL 432.202(gg) defines "supplier" as follows:

   [A] person who the board has identified under rules promulgated by the board as requiring a license to provide casino licensees or casino enterprises with goods or services regarding the . . . business of a proposed or existing casino . . . on a regular or continuing basis, including, but not limited to, junket enterprises, . . . food purveyors, and construction companies.

MCL 432.207a requires suppliers to be licensed and sets forth the requirements for licensure. Subsection 7a(6) provides, in pertinent part, that "[a]ny person . . . that supplies equipment, devices, . . . or services to a licensed casino shall first obtain a supplier's license."

[4] The reasons for the board's primacy in this regard are apparent when one considers that the state's share of the proceeds under MCL 432.212 is based on casino revenues and could be substantially diminished by cash payments for goods or services that artificially diminish the casino's gross receipts. Thus, vendors for whom the board requires a supplier license must meet eligibility requirements and must agree to audits of their books and records. MCL 432.207a(1), (6), (7), and (11); MCL 432.214.

fact or technical expertise." *Id.* at 193. Rather, *Huggett* dealt with the question whether the plaintiff was subject to the jurisdiction of the Department of Natural Resources in light of a statutory exception to the agency's jurisdiction. *Id.* at 192-193. There is no comparable statutory exception to the board's jurisdiction in this case.

We further reject plaintiffs' contention that the undisputed facts presented in this case require the conclusion that plaintiffs' conduct falls outside the jurisdiction of the board as a matter of law. Plaintiffs maintain that they are supplying goods and services to casino patrons and that they supply nothing to casinos. We agree that if plaintiffs' businesses participated in the described coupon program, these businesses would be providing goods and services to casino patrons. However, this conclusion and the conclusion that plaintiffs' businesses are also providing services to the casinos issuing the coupons are not mutually exclusive. The use of such coupons is merely an alternative way for the casinos to obtain these goods and services for their patrons. This accommodation is itself a service to the casinos. Casinos provide these amenities to keep casino patrons in or near the casino as long as possible. Thus, by accepting the casino coupons, the restaurant or hotel supplier provides the issuing casino the service of keeping the casino patrons near the casino while the patrons enjoy food or lodging "on the house."

Moreover, plaintiffs represented themselves as suppliers to casinos in their applications for field of commerce exemptions from the supplier licensing requirements and provided the board with copies of contracts outlining the coupon program. This docu-

mentation constitutes an admission that plaintiffs' businesses are suppliers of services or goods to the casinos with respect to their participation in the coupon program.

As the board points out, even in the absence of a written bilateral contract, the coupon program constitutes a unilateral contract; the coupon is an offer of compensation for performance of a particular act, in this case providing casino patrons with food, lodging, or other amenities. Performance of the act constitutes acceptance of the offer, entitling the party to compensation. Thus, the fact that there may not be a written contract between the casino and plaintiffs' businesses is irrelevant, because an enforceable contract exists nonetheless. Reasonable minds viewing the facts presented in this case can reach differing conclusions whether plaintiffs are "suppliers" under the act. Therefore, the resolution of whether plaintiffs are "suppliers" rests in the exclusive jurisdiction of the board, as clearly intended by the Legislature. MCL 432.202 (gg).

### C. PLAINTIFFS FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES AND FAILED TO ESTABLISH THAT EXHAUSTION OF SUCH REMEDIES WOULD BE FUTILE

Finally, we find no merit in the argument that plaintiffs need not exhaust their administrative remedies. Plaintiffs' conclusory allegations of constitutional violations are insufficient as a matter of law to avoid the regulatory scheme created by the Legislature for the monitoring, licensing, and control of the non-Indian casino industry in Michigan. In *Michigan Supervisors Union OPEIU Local 512 v Dep't of Civil Service*, 209

Mich App 573, 578-579; 531 NW2d 790 (1995), Judge
TAYLOR (now Justice TAYLOR) explained:

> [T]his "constitutional violation" exception to the exhaus-
> tion requirement seems to be an outgrowth of the "futility"
> exception. There is no sense in forcing a plaintiff to plod
> through the lengthy administrative process when only the
> courts have the authority to resolve the controlling consti-
> tutional issue. Accordingly, the exhaustion requirement is
> displaced only when there are no issues in controversy
> other than the constitutional challenge. *Jones v Dep't of
> Corrections*, 185 Mich App 134, 138-139; 460 NW2d 575
> (1991). The mere presence of a constitutional issue is not
> the decisive factor in avoiding the exhaustion requirement.
> If there are factual issues for the agency to resolve, the
> presence of a constitutional issue, or the presence of an
> argument couched in constitutional terms, does not excuse
> the exhaustion requirement even if the administrative
> agency would not be able to provide all the relief requested.
> *Universal Am-Can* [*Ltd v Attorney General*, 197 Mich
> App 34, 38; 494 NW2d 787 (1992)]; *Jones, supra* at 138-139;
> *O'Keefe v Dep't of Social Services*, 162 Mich App 498, 506;
> 413 NW2d 32 (1987); see also *Hardy v State Personnel
> Director*, 392 Mich 1, 5, n 1; 219 NW2d 61 (1974); accord
> *Yakus v United States*, 321 US 414, 435; 64 S Ct 660; 88 L
> Ed 834 (1944).

In the present case, plaintiffs allege that as a result
of the licensing process, plaintiffs suffered constitu-
tional violations. However, it is significant that plain-
tiffs never pursued any licensing determinations to
finality. Consequently, the board never denied plain-
tiffs any license (either a casino license or a casino
supplier license). Thus, the board was not afforded
the opportunity to correct any errors that may have
occurred in the preliminary proceedings. It is pre-
sumed that an administrative agency will correct its
errors if given a chance to do so. *Citizens for Com-*

*mon Sense in Gov't, supra* at 52. We therefore conclude that plaintiffs were required to exhaust administrative remedies notwithstanding their claims of constitutional violations.

For similar reasons, we conclude that plaintiffs have failed to establish that exhaustion of administrative remedies would be futile. Plaintiffs maintain that the board is biased against them. Whether the board is biased against plaintiffs or whether the board otherwise wrongfully denied plaintiffs a supplier license is impossible to determine because plaintiffs have failed to pursue or obtain a final decision on licensure from the board. Futility is not established merely because it may appear at the preliminary stages of administrative proceedings that a litigant would be unable to prevail. The Legislature created an elaborate process whereby the board has the authority and duty to develop rules and decide matters involving the monitoring, licensing, and control of the non-Indian casino industry. The administrative record, through no fault of the board, was not developed and no final determinations have been rendered relating to plaintiffs. Under these circumstances, we cannot conclude that further administrative proceedings would be futile.

### III. CONCLUSION

The circuit court erred in assuming jurisdiction over this matter because the board has exclusive jurisdiction to determine whether plaintiffs are "suppliers" under the act. Plaintiffs are required to exhaust their administrative remedies before being afforded limited judicial review pursuant to the

Administrative Procedures Act.[5] There exists no evidence in this record to support the conclusion that the exhaustion of administrative remedies by the plaintiffs would have been futile. The judgment of the circuit court is reversed.

COOPER, P.J., concurred.

SAWYER, J. (*dissenting*). I respectfully dissent. Although plaintiffs' complaint alleges various claims, at issue is the trial court's September 6, 2002, order denying defendant's motion for summary disposition and granting plaintiffs' motion for partial summary disposition. Although broader coupon programs had been previously involved, the summary disposition order at issue here dealt only with one program proposed by plaintiffs. The trial court's order identifies that program as follows:

> A casino issues complimentary coupons to its patrons for use as payment at non-casino third party businesses ("Third Party Vendors") that do not maintain contractual arrangements with the issuing casino which would restrict, limit, dictate or control the casinos' issuance of complimentary coupons or the location of patrons' use of the coupons. The patron then presents the complimentary coupon to a Third Party Vendor as payment, in whole or in part, for the service provided by the Third Party Vendor to the patron. The Third Party Vendor, having provided the service to the patron, thereafter submits the complimentary coupon to the issuing casino for payment (i.e., redemption). The issuing casino may identify for its patrons, any Third Party Vendors the casino knows to accept complimentary coupons.

---

[5] Under the Michigan Gaming Control and Revenue Act, the circuit court's role is limited to judicial review of the board's final decisions under the Administrative Procedures Act, MCL 24.201 *et seq.* MCL 432.217.

The trial court's order stated the following holdings of the court: (1) The circuit court had jurisdiction to consider plaintiffs' claim that defendant lacks jurisdiction to regulate a third party vendor participating in a complimentary coupon program; (2) an actual and justiciable controversy exists regarding plaintiffs' proposed complimentary coupon program; (3) plaintiffs were not required to exhaust administrative remedies before going to circuit court; and (4) under plaintiffs' proposed complimentary coupon program, third party vendors would be providing services to casino patrons and not to the casinos and, therefore, the third party vendors would not be casino suppliers subject to defendant's jurisdiction and authority to regulate.

We granted defendant's application for leave to appeal to address the following questions raised in the application:

I. Should the Michigan Gaming Control Board be given an opportunity to interpret the supplier licensing requirements in the Gaming Control and Revenue Act and Administrative Rules before a party may seek relief in the Circuit Court?

II. Can the Circuit Court issue declaratory relief based upon hypothetical facts when no case or controversy currently exists?

III. Does the Michigan Gaming Control Board have regulatory authority over restaurants and hotels that provide goods or services to casino patrons that are paid for by complimentary coupons issued by the casino and then redeemed by those restaurants and hotels?

Turning to the first question, defendant argues that it has primary and exclusive jurisdiction under the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq.*, over licensing, regulation, and control

of casino gaming and that plaintiffs could not seek relief in the circuit court because they had failed to exhaust their administrative remedies. In essence, defendant argues it was for defendant to determine in the first place whether plaintiffs' businesses need to have a supplier license or exemption in order to participate in the complimentary coupon program. Like the trial court, I disagree.

The trial court rejected defendant's argument, relying on *Silverman v Univ of Michigan Bd of Regents*, 445 Mich 209; 516 NW2d 54 (1994), and *Huggett v Dep't of Natural Resources*, 232 Mich App 188; 590 NW2d 747 (1998), aff'd 464 Mich 711; 629 NW2d 915 (2001). Not at issue in this appeal is defendant's denial of the "field of commerce" exemption requests or whether plaintiffs' businesses should be issued supplier licenses. Rather, at issue here is whether plaintiffs, having taken the position that hospitality vendors who would participate in the proposed complimentary coupon program would not be a "casino supplier" subject to licensing, may obtain such a declaration in circuit court or whether such a question must first be directed to defendant. I agree that the circuit court had the jurisdiction to answer the question without defendant's first ruling on it.

In *Huggett*, this Court addressed the question of the jurisdiction of the Department of Natural Resources with respect to whether a wetland permit was needed. The plaintiffs had applied for a permit to construct a cranberry farm, which permit was denied. Before the conclusion of the administrative proceedings, the plaintiffs filed an action in the circuit court seeking a declaration that the proposed activity was exempt from the statutory wetland permit require-

ment. The defendant argued that the plaintiffs' claim should have been denied because of the plaintiffs' failure to first exhaust their administrative remedies. This Court disagreed, opining as follows:

> In *Int'l Business Machines Corp* [*v Dep't of Treasury*, 75 Mich App 604; 255 NW2d 702 (1977)], this Court allowed the plaintiff to seek relief in the circuit court even though the available administrative remedies had not been exhausted because the plaintiff did not challenge the propriety of the agency action taken (declaration of tax liability). Instead, the plaintiff argued that the agency had no authority to take any action in the first place. Because the plaintiff sought to avoid submitting the dispute to the agency procedures, the "very harm that plaintiff seeks to avoid would inevitably occur if plaintiff were required to exhaust administrative remedies before access to judicial review." *Id.* at 610. This Court also considered whether the agency's statutory authority to act was clearly framed for the circuit court, whether extensive findings of fact were unnecessary, and whether a resolution of the issue did not demand special technical expertise. *Id.*; see also *Universal Am-Can Ltd v Attorney General*, 197 Mich App 34, 38-39; 494 NW2d 787 (1992) (holding that where the plaintiff claimed that the agency lacked statutory authority to regulate the plaintiff's activity, "both judicial economy and the interests of justice supported the plaintiff's actions in filing a complaint in the circuit court for declaratory relief"). [*Huggett, supra* at 192.]

In its brief on appeal, defendant simply avoids dealing with *Huggett* at all. Rather, defendant first argues that it has primary and exclusive jurisdiction over casino gaming licensing and then bootstraps that into an argument that that jurisdiction includes the determination of the scope of their licensing authority, with an argument of failure to exhaust administrative remedies tacked on for good measure. Turning first to

the issue whether defendant's jurisdiction is "exclusive," the case defendant relies on, *Burt Twp v Dep't of Natural Resources*, 459 Mich 659; 593 NW2d 534 (1999), is inapplicable. *Burt* dealt with the issue of a state agency's jurisdiction relative to the local zoning authority. It does not stand for the proposition that an agency's jurisdiction is exclusive of judicial review.

Turning to the issue of primary jurisdiction, this concept was discussed at length by the Supreme Court in *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185; 631 NW2d 733 (2001). As the Court explained, the doctrine of primary jurisdiction is invoked where an agency is better suited to address a complex issue than is the court, even if the court has jurisdiction over the claim:

> The doctrine of primary jurisdiction also reflects practical concerns regarding respect for the agency's legislatively imposed regulatory duties. Adhering to the doctrine of primary jurisdiction reinforces the expertise of the agency to which the courts are deferring the matter, and avoids the expenditure of judicial resources for issues that can better be resolved by the agency. "A question of 'primary jurisdiction' arises when a claim may be cognizable in a court but initial resolution of issues within the special competence of an administrative agency is required." [*Dist of Columbia v Thompson*, 570 A2d 277, 288 (DC App, 1990).] [*Travelers, supra* at 197.]

The Court further noted that the doctrine of primary jurisdiction is also closely related to the requirement of exhaustion of administrative remedies. *Id.*[1]

---

[1] The distinction between the two is that under exhaustion of remedies, the claim *must* first be brought before the administrative agency. Under the doctrine of primary jurisdiction, the court may hear the claim before any conclusion by the administrative agency, but the court chooses to defer to the administrative agency to address the question in the first

Given the nature of the claim before us, I am not convinced that the doctrine of primary jurisdiction applies. We are not faced with the question whether a supplier license or an exemption should have been issued. Rather, at issue is the question whether defendant's regulatory authority extends to third-party vendors who accept a casino's complimentary coupons without any preexisting contractual relationship with the casino. In essence, plaintiffs are arguing that defendant is interfering with their business interests by extending its regulatory reach beyond that permitted by statute. The question of the scope of jurisdiction granted defendant by the Legislature does not, in my view, invoke a specialized analysis to which the courts should defer to an agency's expertise. That is, the question whether defendant's authority extends to plaintiffs' businesses under the program proposed by plaintiffs is a simple matter of statutory interpretation, a question well suited for the courts to answer.[2]

Indeed, this brings us full circle to the *Huggett* decision. As noted in *Huggett, supra* at 192-193, an argument that the agency has no authority to act in the first place is properly cognizable in court. For these reasons, I agree that the trial court could properly address this issue without deferring to defendant under either the doctrine of primary jurisdiction or

---

instance. *Id.*, quoting *United States v Western P R Co*, 352 US 59, 63-64; 77 S Ct 161; 1 L Ed 2d 126 (1956).

[2] Indeed, the ultimate conclusion following from defendant's argument is that the courts should defer to an administrative agency's determination of the agency's statutory powers. In other words, that an administrative agency may do whatever the administrative agency determines it can do, without interference by the courts. I find that position to be untenable. Our citizens rightfully expect to be able to look to the courts for protection against an overreaching bureaucracy.

the requirement of exhaustion of administrative remedies.

Defendant next argues that the trial court improperly granted declaratory relief on the basis of a hypothetical fact situation for which no actual case or controversy existed. I disagree. This Court discussed the "actual controversy" requirement in *Citizens for Common Sense in Gov't v Attorney General*, 243 Mich App 43, 54-55; 620 NW2d 546 (2000):

> MCR 2.605(A) empowers the circuit court to issue a declaratory judgment in "a case of actual controversy." "[T]he existence of an 'actual controversy' is condition precedent to invocation of declaratory relief." *Kuhn v East Detroit*, 50 Mich App 502, 504; 213 NW2d 599 (1973). This Court lacks jurisdiction because there is no case of actual controversy.
>
> Generally, an actual controversy exists where a declaratory judgment is necessary to guide a plaintiff's future conduct in order to preserve the plaintiff's legal rights. *Shavers v Attorney General*, 402 Mich 554, 588-589; 267 NW2d 72 (1978); *Durant v Michigan (On Remand)*, 238 Mich App 185, 204-205; 605 NW2d 66 (1999). "[W]hat is essential to an 'actual controversy' under the declaratory judgment rule is that plaintiff plead and prove facts which indicate an adverse interest necessitating a sharpening of the issues raised." *Shavers, supra* at 589; *Fieger v Comm'r of Ins*, 174 Mich App 467, 470-471; 437 NW2d 271 (1988). Generally, where the injury sought to be prevented is merely hypothetical, a case of actual controversy does not exist. *Recall Blanchard Comm v Secretary of State*, 146 Mich App 117, 121; 380 NW2d 71 (1985).

I agree with the trial court that this case presents an actual controversy. Although, as defendant points out, the precise complimentary coupon program identified in the trial court's order has not been implemented, clearly there is an actual controversy regard-

ing complimentary coupons and the need for supplier licensing. Defendant initially sent a directive to the Detroit casinos stating that they could not do business with plaintiffs' businesses unless those businesses obtained supplier licenses. Thereafter, plaintiffs' businesses endeavored to provide services through a relationship with Detroit Hospitality, L.L.C. That is, Detroit Hospitality contracted with casinos to provide hospitality services through a complimentary coupon program and then contracted with various vendors, including plaintiffs' businesses, to actually supply those services. Defendant again sent a directive stating that the casinos could not participate in such a program unless the businesses actually providing the hospitality services were licensed as a supplier or granted an exemption. Thus, there is an actual controversy regarding the scope of defendant's authority over vendors. The hypothetical coupon program identified by plaintiffs and the subject of the trial court's order merely represents an attempt to at least partially define the limits of defendant's authority.[3]

Defendant has clearly taken the position that for any hospitality vendor to receive payment from a casino for providing hospitality services to a casino patron that vendor must obtain a supplier license or be granted an exemption. Although the original focus

---

[3] It does not appear that plaintiffs have conceded the need for licensure as a supplier in the context of their previous relationship with Detroit Hospitality. Indeed, during oral argument, plaintiffs' counsel indicated that plaintiffs would invite this Court to address the need for licensure in that situation, but admitted that the issue was not before this Court at this time under the order granting partial summary disposition. Accordingly, the issue is properly left for the trial court to resolve if it remains an issue in this case.

of plaintiffs' complaint does appear to be more on the relationship they had with Detroit Hospitality before defendant ordered that relationship to be terminated, the program identified in the trial court's order merely draws the line further away from the casino. Moreover, plaintiffs' actual rights are at issue and an answer to the question would provide a guide to future conduct. Each day that plaintiffs' businesses are not permitted to participate in a complimentary coupon program represents lost revenue because the casinos' patrons go elsewhere. Further, defendant's regulatory stance, including levying a substantial fine against Greektown Casino for paying for complimentary hospitality services rendered by an unlicensed vendor, would provide a chilling effect for the casinos engaging in any such program where the program has not been previously approved.

Furthermore, defendant's argument that there was inadequate notice of the issue to allow for discovery is disingenuous. First, the complimentary coupon program at issue here was the subject of questions to defendant's executive director during his deposition. Thus, not only was there adequate notice to make it the subject of discovery, it *was* the subject of discovery. Similarly, contrary to defendant's assertion, plaintiffs did factually establish the nature of their program through affidavit or otherwise. At most, the program outlined in the trial court's order is slightly more detailed than that previously set forth by plaintiffs, but that represents the trial court's more carefully drawing the lines around the program in order to be able to definitively rule that the program is outside defendant's regulatory jurisdiction.

For these reasons, I conclude that there was an actual case of controversy for which the trial court could grant declaratory relief.

Finally, turning to the substantive issue of this case, I would conclude that the complimentary coupon program identified in the trial court's order lies outside defendant's regulatory authority and that defendant may not require such third-party vendors to obtain a supplier license or exemption. The trial court concluded that third-party vendors under plaintiffs' proposed complimentary coupon program provide services to casino patrons, not to the casinos themselves, and, therefore, are not casino suppliers. I agree.

MCL 432.202(gg) defines "supplier" as follows:

> [A] person who the board has identified under rules promulgated by the board as requiring a license to provide casino licensees or casino enterprises with goods or services regarding the realty, construction, maintenance, or business of a proposed or existing casino, casino enterprise, or related facility on a regular or continuing basis, including, but not limited to, junket enterprises, security businesses, manufacturers, distributors, persons who service gaming devices or equipment, garbage haulers, maintenance companies, food purveyors, and construction companies.

Although defendant has also defined the term "supplier" by rule, we need not consider the administrative rules in resolving this issue. First, the definition under the administrative rules essentially reiterates the statutory definition with minor format changes. Second, the statute does not grant defendant unlimited authority to define "supplier." Rather, the statutory grant of power to defendant limits defendant to

defining a "supplier" as a person who must be licensed in order "to provide casino licensees or casino enterprises with goods or services . . . ." *Id.* That is, defendant may adopt a regulatory definition of "supplier" that excludes persons who do, in fact, provide goods or services to a casino but who defendant has determined do not need to be licensed as a "supplier."[4] However, the statute does not permit defendant to define as a "supplier" a person who does not provide goods or services to a casino.

We must interpret a statute to give effect to the legislative intent as shown by the words used by the Legislature in the statute itself:

> When interpreting statutory language, our obligation is to ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute. *Wickens v Oakwood Healthcare System*, 465 Mich 53, 60; 631 NW2d 686 (2001). When the Legislature has unambiguously conveyed its intent in a statute, the statute speaks for itself, and judicial construction is not permitted. *Huggett v Dep't of Natural Resources*, 464 Mich 711, 717; 629 NW2d 915 (2001); *Donajkowski* [*v Alpena Power Co*, 460 Mich 243, 248; 596 NW2d 574 (1999)]. Because the proper role of the judiciary is to interpret and not write the law, courts simply lack authority to venture beyond the unambiguous text of a statute. [*Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002).]

The clear and unambiguous language of the statute provides that a "supplier" must be a person who provides "casino licensees or casino enterprises with goods or services . . . ." MCL 432.202(gg). Defendant

---

[4] For example, defendant could presumably exclude a publicly traded corporation from the definition of "supplier" if it were to conclude that a publicly traded corporation is an entity not "requiring a license" in order to provide goods or services to a casino.

cannot expand that basic statutory limitation of the definition of "supplier" for the reasons explained in *In re Quality of Service Standards for Regulated Telecom Services*, 204 Mich App 607, 611; 516 NW2d 142 (1994):

> Generally, a statute that grants power to an administrative agency is strictly construed. *Mason Co Civic Research Council v Mason Co*, 343 Mich 313, 326; 72 NW2d 292 (1955). Administrative authority must be granted affirmatively or plainly, because doubtful power does not exist. *Id.* at 326-327; *Taylor v Michigan Public Utilities Comm*, 217 Mich 400, 402-403; 186 NW 485 (1922).

Thus, the question presented here is whether a third-party vendor who accepts complimentary coupons under the conditions set forth in the trial court's order provides goods or services to a casino and, therefore, may be defined as a "supplier" under the statute. Plaintiffs and the trial court take the position that the goods and services are provided to the casino patron, while defendant takes the position that the goods and services are provided to the casino. I agree with plaintiffs and the trial court.

It is the casino patron who sleeps in the hotel room and eats the meal in the restaurant, not the casino. More to the point, the third-party vendor is providing nothing to the casino itself. The third-party vendor has not obligated itself to accept the coupon, provide a discount,[5] or guarantee availability (e.g., reserve a group of rooms for use by casino patrons only), and

---

[5] I note that there was some discussion whether such coupons might provide a discount under their terms and conditions (e.g., the casino would pay $45 if the third-party vendor provided the casino patron with $50 worth of food). However, discounts were not addressed in the trial court's order. In any event, I merely note that under the proposed pro-

so forth. Furthermore, under the program outlined in the trial court's opinion, the casino has no control over where the coupon is used. That is, while no vendor is required to accept the coupon, the casino does not limit where it may be used. Thus, a casino patron may present the coupon at one of plaintiffs' businesses, or at a competitor's.

Indeed, defendant does not clearly identify what goods or services are being provided to the casino. At most, defendant argues that the complimentary coupon program establishes another means by which a casino is able to provide amenities to its patrons. In my view, however, this falls short of showing that goods or services are being provided to the casino. The goods or services are still being provided to the casino patron by a vendor of the patron's choosing; at most, the casino is picking up the tab. That is, I see a fundamental difference between a food wholesaler or a caterer, chosen by the casino, who may contract with a casino to deliver food to the casino in order for the casino to set up a complimentary buffet for the enjoyment of its patrons and a casino's giving its patrons a coupon that the patrons may redeem anywhere the patrons so choose (assuming the vendor is willing to accept the coupon).

Defendant also argues that a business relationship is established between a vendor and a casino because the coupon represents an offer by the casino to pay and the vendor's taking of the coupon from the customer constitutes an acceptance. First, this is tenuous logic at best. Taken to its logical conclusion, that

---

gram, vendors have not contractually obligated themselves to provide a discount.

would mean that a Federal Reserve Bank is a contractual party to every transaction in which money changes hands because the presentation of a Federal Reserve Note in payment for a purchase constitutes an offer and acceptance and, therefore, a contract with the issuing authority (the Federal Reserve Bank). Second, and more importantly, defendant's argument makes an unwarranted assumption; namely, that the mere existence of a business relationship with a casino makes one a "supplier" to the casino in need of a supplier's license. However, as discussed above, the term "supplier" is a term of art that is defined by the statute to refer to only those persons who supply goods or services to a casino. Thus, if a person has a business relationship with a casino that does not involve supplying goods or services to the casino, that person is not a "supplier" within the meaning of the statute.

Ultimately, perhaps the most telling point in this analysis is the following statement in defendant's brief on appeal (made in the context of defendant's "business relationship" argument):

> In the scenario presented by the Circuit Court's Order, there is an offer from the casino that is evidenced by the coupon. The offer is to pay for *goods and services provided* by the restaurants and hotels *to the casino's patrons*. Acceptance of the offer occurs when the hotel or restaurant accepts the coupon with the understanding that it will be paid for the *services or goods provided to the casino's patrons* in return for accepting the coupon. [Emphasis added.]

Thus, ultimately, even defendant admits that the goods and services are being provided to the casinos' patrons, not to the casinos.

In sum, this issue was properly before the trial court for resolution. Further, the trial court correctly interpreted the statute as excluding third-party vendors, under the complimentary coupon program outlined in the trial court's order, from the statutory definition of "supplier," and, thus, such vendors are not subject to the supplier licensing requirements.

I would affirm.